UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

<pre>
MICHAEL V.M.,[1]              ) Case No. CV 20-2876-JPR
                              )
         Plaintiff,           )
                              ) **MEMORANDUM DECISION AND ORDER**
    v.                        ) **AFFIRMING COMMISSIONER**
                              )
ANDREW SAUL, Commissioner     )
of Social Security,           )
                              )
         Defendant.           )
_____)
</pre>

I. PROCEEDINGS

Plaintiff seeks review of the Commissioner's final decision terminating his Social Security disability insurance benefits. The matter is before the Court on the parties' Joint Stipulation, filed December 23, 2020, which the Court has taken under submission without oral argument. For the reasons discussed below, the Commissioner's decision is affirmed.

---

[1] Plaintiff's name is partially redacted in line with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

## II. BACKGROUND

Plaintiff was born in 1962. (Administrative Record ("AR") 231.) He obtained his GED (AR 203) but has not been employed since 2000 (AR 204). He is a veteran of the U.S. Army. (AR 585.)

In an October 12, 2005 determination, Plaintiff was found disabled beginning December 1, 2001. (AR 233.) On August 14, 2014, the Commissioner found that he was no longer disabled as of August 2014. (AR 284-87.) A disability hearing officer upheld that decision. (AR 294-305.) Plaintiff requested a hearing before an Administrative Law Judge, and after one during which Plaintiff, who was not represented by counsel, testified (AR 160-94), the ALJ issued an unfavorable decision (AR 236-50).

Plaintiff sought Appeals Council review. (AR 348.) It remanded the case for a new hearing because the ALJ failed to properly evaluate Plaintiff's mental impairments, among other reasons. (AR 255-60.) A different ALJ conducted the new hearing (AR 195-230), at which Plaintiff, now represented by counsel, and a vocational expert testified (AR 202-27). In his November 6, 2018 decision, the ALJ found that on June 30, 2015, Plaintiff's disability ended. (AR 261-83.) Plaintiff sought Appeals Council review (AR 409-16), which was granted (AR 417-20). On April 24, 2020, the Appeals Council adopted all the ALJ's findings except for the date on which Plaintiff's disability ended. (AR 4-7.) It found that his disability ended on August 1, 2014, not June 30, 2015. (AR 5.) This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the

Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is "more than a mere scintilla, but less than a preponderance." Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. Id. at 720-21.

**IV. THE EVALUATION OF DISABILITY**

People are "disabled" for Social Security purposes if they can't engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

A. The Eight-Step Evaluation Process

The ALJ follows an eight-step sequential evaluation process to assess whether a recipient continues to be disabled. 20 C.F.R. § 404.1594(f); see also Nathan v. Colvin, 551 F. App'x 404, 407 (9th Cir. 2014); Held v. Colvin, 82 F. Supp. 3d 1033, 1037 (N.D. Cal. 2015). In the first step, the Commissioner must determine whether the recipient is currently engaged in substantial gainful activity; if so, he is no longer disabled. § 404.1594(f)(1); see also McCalmon v. Astrue, 319 F. App'x 658, 659 (9th Cir. 2009). If not, the second step requires the Commissioner to determine whether the recipient has an impairment or combination of impairments that meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, he continues to be disabled. § 404.1594(f)(2). If not, the third step requires the Commissioner to determine whether medical improvement has occurred.[2] § 404.1594(f)(3). If so, the analysis continues to step four; if not, it proceeds to step five. Id.

If medical improvement has occurred, the fourth step requires the Commissioner to determine whether the improvement is related to the recipient's ability to work — that is, whether his

---

[2] Medical improvement is "any decrease in the medical severity of [a recipient's] impairment(s) which was present at the time of the most recent favorable medical decision that [the recipient was] disabled or continued to be disabled." § 404.1594(b)(1). "A determination that there has been a decrease in medical severity" must be based on "improvement in the symptoms, signs, and/or laboratory findings associated with [a recipient's] impairment(s)." Id.

4

residual functional capacity ("RFC")[3] has increased since the most recent favorable medical decision. § 404.1594(f)(4). If medical improvement is not related to his ability to work, the analysis continues to step five; if it is, it proceeds to step six. Id.

If medical improvement has not occurred or is not related to the recipient's ability to work, the fifth step requires the Commissioner to determine whether an exception to medical improvement applies. § 404.1594(f)(5). Under the first group of exceptions, the Commissioner may find a recipient no longer disabled even though he has not medically improved if he can engage in substantial gainful activity; if one of those exceptions applies, the analysis proceeds to step six. § 404.1594(d). Under the second group of exceptions, the Commissioner may find a recipient no longer disabled without determining medical improvement or an ability to engage in substantial gainful activity; if one of those exceptions applies, the recipient is no longer disabled. § 404.1594(e). If no exceptions apply, he continues to be disabled. § 404.1594(f)(5).

The sixth step requires the Commissioner to determine whether all the recipient's current impairments in combination are "severe," which means that they significantly limit his ability to do basic work activities; if not, he is no longer disabled. § 404.1594(f)(6). If so, the seventh step requires the Commissioner to determine whether he has sufficient RFC,

---

[3] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 404.1545(a)(1); see also Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

5

"based on all [his] current impairments," to perform his past relevant work; if so, he is no longer disabled. § 404.1594(f)(7).

If the recipient cannot do any past work or has none, the eighth and final step requires the Commissioner to determine, using the RFC assessed in step seven, whether he can perform any other substantial gainful work; if so, he is no longer disabled. § 404.1594(f)(8). If not, he continues to be disabled. Id.

B. The ALJ's Application of the Eight-Step Process

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity from October 12, 2005, the date of his most recent favorable medical decision,[4] through June 30, 2015. (AR 266.) In the 2005 CPD, Plaintiff had the impairments of depression, mood disorder, and bipolar disorder. (Id.) The ALJ found that as of June 30, 2015, he had the medically determinable impairments of arthrosis of the left wrist, high blood pressure, and affective disorder. (Id.)

At step two, the ALJ concluded that these impairments did not meet or equal a Listing. (AR 266-68.) At step three, he found medical improvement: "The medical evidence," the ALJ wrote, "supports a finding that, as of June 30, 2015," the impairments present at the time of the CPD had decreased in severity. (AR 268.) At step four, he determined that Plaintiff's medical improvement was related to his ability to work because it led to

---

[4] The most recent favorable medical decision is also known as the comparison-point decision ("CPD"). See Program Operations Manual System (POMS) DI 28010.105, U.S. Soc. Sec. Admin. (Jan. 13, 2016), http://secure.ssa.gov/apps10/poms.nsf/lnx/0428010105; see also § 404.1594(b)(7).

"an increase in [his] residual functional capacity." (Id.) Skipping to step six, he found that as of June 30, 2015, Plaintiff "continued to have a severe impairment or combination of impairments." (Id.) The ALJ noted that those impairments "caused more than minimal limitation in [Plaintiff's] ability to perform basic work activities." (Id.)

At step seven, the ALJ concluded that based on Plaintiff's impairments then present, he retained the RFC for "medium work" with these limitations: frequent postural activity; no more than occasional ladder climbing; "avoidance of concentrated exposure to extreme cold"; "no more than occasional operation of controls with the left hand"; and only "simple, routine tasks with no public contact." (Id.) Plaintiff had no past relevant work. (AR 276.)

At step eight, the ALJ accepted the vocational expert's testimony that an individual of Plaintiff's age, education, work experience, and RFC could perform the work of cleaner, kitchen helper, and hand packager. (AR 277.) Plaintiff thus "was able to perform a significant number of jobs in the national economy" as of June 30, 2015 (AR 276-77), ending his disability (AR 277).

As noted above, the Appeals Council adopted all the ALJ's findings except for the date on which Plaintiff's disability ended. (AR 5.) It found that disability ended on August 1, 2014, and that he did not become disabled again through June 30, 2015, the date last insured. (AR 7.)

**V. DISCUSSION**

Plaintiff raises a sole claim on appeal: the ALJ improperly rejected the opinion of Dr. Michelle Mehta. (See J. Stip. at 5-

11.) As discussed below, the ALJ provided specific and legitimate reasons for giving the opinion "no weight," and remand is not warranted.

A. Applicable Law

Three types of physicians may offer opinions in Social Security cases: those who directly treated the plaintiff, those who examined but did not treat the plaintiff, and those who did neither. See Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995) (as amended Apr. 9, 1996). A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's. Id.; see § 404.1527(c)(1)-(2).[5]

The ALJ may discount a physician's opinion regardless of whether it is contradicted. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989); see also Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008). When a doctor's opinion is not contradicted by other medical-opinion evidence, however, it may be rejected only for a "clear and convincing" reason. Magallanes, 881 F.2d at 751 (citations omitted); Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31). When it is contradicted, the ALJ need provide only a "specific and legitimate" reason for discounting it. Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31). The weight given a

---

[5] For claims filed on or after March 27, 2017, the rules in § 404.1520c (not § 404.1527) apply. See § 404.1520c (evaluating opinion evidence for claims filed on or after Mar. 27, 2017). Plaintiff's claim was filed before March 27, 2017, however, and the Court therefore analyzes it under former § 404.1527.

8

doctor's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things. See § 404.1527(c); see also Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (factors in assessing physician's opinion include length of treatment relationship, frequency of examination, and nature and extent of treatment relationship).

    B.    Relevant Background

        1.    Dr. Mehta's letter

Dr. Mehta, a staff psychiatrist at a VA mental-health clinic, authored a one-page letter for Plaintiff on November 17, 2014. (AR 860.) In it, she listed his "prior diagnoses of mixed anxiety and depression, polysubstance dependence in remission, and some cluster A and B personality traits," with the possibility of posttraumatic stress disorder. (Id.) She noted that he "describe[d] difficulties" with his behavior, concentration, and memory. (Id.) He also told her that he did not "socialize with others" and lacked "emotional support" from those he could "trust." (Id.)

Dr. Mehta found Plaintiff's mood "irritable," his thought process "tangential," and his thought content "significant for description of limited frustration tolerance when faced with a number of stressors." (Id.) She observed that

> [Plaintiff] has described significant difficulties with anger management as well as coping with stress in employment situations, especially when faced with negative interactions with co-workers or physical threats from other individuals. His exposure to violence in his early life and during prior incarcerations as well as

9

ongoing psychosocial stressors has likely contributed to
his impairments in functioning.

(Id.) She concluded that "[i]n his current state, he is unlikely to be able to seek or participate in competitive employment." (Id.)

Although the ALJ described Dr. Mehta as a "treating physician" (AR 274) and the parties do not dispute that characterization, the record contains no treatment notes from her (see generally AR 33-159, 600-869).

### 2. The ALJ's decision

The ALJ gave "no weight" to Dr. Mehta's assessment. (AR 274.) He reasoned that it lacked support from the objective record, outlining three ways that was so. (Id.)

First, Plaintiff's statements that he had problems socializing and obtaining adequate emotional support conflicted with the record. (Id.) The ALJ noted that Plaintiff simply preferred his pastor and church members over the VA for resources and to talk through stressors; participated in church; liked where he lived because of its proximity to family, friends, his church, and the VA; and "enjoyed walks in his neighborhood and reconnecting with family and friends, with whom he spent his days visiting." (Id.) He "clearly socialized with others and had emotional support he could trust," the ALJ concluded. (Id.)

Second, Plaintiff's statements about his concentration and memory cut against evidence showing that he paid his bills on time, cared for his personal needs, managed his medications, maintained a clean home, watched television, used computers, sought to return to school, and enjoyed "handy work tasks."

10

(Id.)

Finally, contrary to Dr. Mehta's observations, the record "repeatedly noted a euthymic mood, clear and linear thought processes, and normal speech." (Id.) Plaintiff was "alert and oriented." (Id.) He "repeatedly stated he was doing well" and acknowledged being "willing and able" to return to work. (Id.) He also "retained job skills and an interest in vocational development." (Id.)

C. Analysis

1. Dr. Mehta does not qualify as a treating source

A treating physician is a claimant's own physician who has provided or continues to provide him with medical treatment or evaluation in an "ongoing treatment relationship." See Benton ex rel. Benton v. Barnhart, 331 F.3d 1030, 1035 (9th Cir. 2003); § 404.1527(a)(2). A treatment relationship is "ongoing" "when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [his] medical condition(s)." § 404.1527(a)(2). If a patient elicits the help of a physician only to obtain a report to support his disability claim, that physician is not treating him. Id.

No evidence shows that Dr. Mehta ever treated Plaintiff. To the contrary, she reported that on November 17, 2014, the same day she wrote the letter, he "present[ed] for initial psychiatric evaluation." (AR 128.) He said that he was "not interested in any treatment offered at [the clinic] and [was] here only because he need[ed] paperwork completed for the department of social

11

services." (Id.) Likewise, under the heading "Presenting Chief Complaint," Dr. Mehta quoted Plaintiff: "'[T]he Department of Social Services requires I have an evaluation done.'" (Id.) Later that day, Dr. Mehta noted that he "clarifie[d] at intake today that he does not want treatment but wants documentation for the department of social services so that he can maintain his current benefits." (AR 127.)

Plaintiff did not have an "ongoing treatment relationship" with Dr. Mehta. Thus, she was not a treating source. Her opinion, then, was not entitled to the greater deference the ALJ assumed. See Cline v. Astrue, No. ED CV 08-463-PLA, 2009 WL 2163507, at *5 n.4 (C.D. Cal. July 16, 2009) (noting that physician likely did not qualify as treating source because "he examined plaintiff on only one occasion"). But even if Dr. Mehta did qualify as a treating source and had regularly treated Plaintiff, the ALJ still would not have erred. As discussed below, he provided specific and legitimate reasons supported by substantial evidence for rejecting her opinion.

    2.  The ALJ properly gave Dr. Mehta's opinion "no weight"

As Plaintiff acknowledges (J. Stip. at 7), Dr. Mehta's opinion conflicted with that of nonexamining state-agency physician S. Gold.[6] Dr. Gold opined in August 2014 that Plaintiff's physical and mental conditions had significantly

---

[6] Dr. Gold's electronic signature includes a medical specialty code of 37, indicating psychiatry. (AR 723); see POMS DI 24501.004, U.S. Soc. Sec. Admin. (May 5, 2015), https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501004.

12

improved and that his mental impairments were no longer severe. (AR 723-33.) Three months later, state-agency reviewing physician R. Tashjian[7] affirmed Dr. Gold's opinion.[8] (AR 849.) Thus, the ALJ needed to provide only a "specific and legitimate reason" for giving Dr. Mehta's opinion no weight. Carmickle, 533 F.3d at 1164 (citation omitted). He did so.

A conflict between a treating physician's opinion and the "greater objective record" constitutes a specific and legitimate reason for rejecting that opinion. Simon v. Colvin, 582 F. App'x 671, 671-72 (9th Cir. 2014); see also Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004) (rejecting treating physician's opinion that was "conclusory, brief, and unsupported by the record as a whole").

The ALJ properly found that Dr. Mehta's opinion lacked support from the objective record in at least three ways. First, her mental-status findings — irritable mood, tangential thought process, and limited frustration tolerance — conflicted with the objective record. (AR 274.) VA records from 2013 and 2014 "repeatedly noted [Plaintiff's] euthymic mood, clear and linear thought processes, and normal speech," the ALJ correctly observed. (Id. (citing AR 746, 760, 773, 780, 797, 800, 828).)

---

[7] Like Dr. Gold, Dr. Tashjian's electronic signature includes a medical specialty code of 37, indicating psychiatry. (AR 849); see POMS DI 24501.004, U.S. Soc. Sec. Admin. (May 5, 2015), https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501004.

[8] The ALJ gave "less weight" to the opinions of these doctors "because evidence suggested [Plaintiff] did continue to struggle with some mild to moderate mental limitations." (AR 273.)

In an April 2014 home visit, for example, Plaintiff reported "doing well." (AR 752.) The social worker assessed that he "presented alert and oriented x 4," his "speech was normal in rate and rhythm," his "thought process was linear and clear," and his "mood was euthymic and affect was congruent." (AR 753.) Likewise, in a June 2014 phone call, Plaintiff reported that he was doing "fine." (AR 745.) And the social worker echoed her April 2014 assessment: he "sounded alert and oriented x 4," his "speech was normal in rate and rhythm," his "thought process was linear and clear," and his "mood was euthymic." (AR 746.) Two months later, he again "reported that he [was] overall doing well." (AR 818.) The VA records teemed with similar reports and assessments. (See, e.g., AR 747, 749, 755-59, 761, 764-66, 773, 778-80, 782, 784-85, 789, 793, 795-97, 819-20, 828, 830.)

The ALJ also correctly noted that Plaintiff stated in September 2013 that he was "willing and able" to return to work. (AR 791.) In line with that, the ALJ observed, an April 2014 mental-health treatment-plan note said that he had "no restrictions." (AR 750.) That note also remarked that he possessed "job skills" and an "interest[] in vocational development." (Id.)

Second, Plaintiff's statements to Dr. Mehta that he did not socialize or possess adequate emotional support contradicted the objective record. (AR 274.) In April 2014, for example, he relayed to a VA social worker that he attended a family reunion and that it "was a good experience." (AR 752.) He also "reported that he reconnected with many family and friends." (Id.) The next month, he told the social worker that he "spends

14

his time visiting family and friends" and helping at his church. (AR 749.) Then, in late June 2014, he reported that he "spen[t] time helping at his church" and that he "coped" with stressors with help from "his pastor and friends." (AR 746.)

Other VA records confirm Plaintiff's socialization and emotional support: his pastor and members of his church "provide[d] spiritual support, [would] try to help him obtain items for his new apartment, and . . . assist[ed] with security deposit funds" (AR 782 (Oct. 2013)); he appeared "euthymic, as evidenced by . . . the support he [was] receiving from his church" (AR 773 (Nov. 2013)); "[he was] very satisfied with [his apartment's] convenient location" because of his access to family, friends, and his church (AR 763 (Dec. 2013)); "he [was] receiving support from his friends and church members" (AR 758 (Feb. 2014)); and "he spen[t] his time . . . volunteering at church[] and visiting with friends and family" (AR 819 (Aug. 2014)).

Third, Plaintiff's statements to Dr. Mehta about his difficulties with concentration and memory conflicted with the objective record. (AR 274.) During an April 2014 home visit, for example, he reported that his bills were "current." (AR 752.) He was also "setting aside $60 each month for the [utility] bill and plan[ned] to continue with this savings plan." (AR 753.) He reported to social workers at least five other times during 2014 that his bills were "current." (AR 748, 755, 757, 760, 818-19.) He also successfully searched the internet on his own to find an apartment to rent. (AR 763, 766, 777-80.)

And at all Plaintiff's home visits from December 2013 to

15

August 2014 — seven total — the social worker reported that his home was "clean and organized." (AR 748, 752, 755, 757, 760, 762, 818.) He "practic[ed] his computer skills," enjoyed "handy work tasks," and went to the gym. (AR 760.) He also had an interest in returning to school to learn computer skills. (AR 791.) Indeed, in September 2013, one social worker concluded that he was "independent in all activities of daily living and most instrumental activities of daily living[,] including cleaning, shopping, food preparation, laundry, [and] transportation, and [he] can administer all his own medication." (AR 791.) The ALJ, then, rightly concluded that Plaintiff "clearly had sufficient concentration and memory to be able to pay his bills on time, as well as care [for] his personal needs and maintain a clean home." (AR 274.)

In sum, both Dr. Mehta's mental-status findings and Plaintiff's self-reports recounted in her letter conflicted with the greater objective record. The ALJ detailed those conflicts. Thus, he properly rejected her opinion that Plaintiff was "unlikely to be able to seek or participate in competitive employment."

Plaintiff's contrary arguments fail. He first contends that the "longitudinal picture of [his] presentation fails to demonstrate sustained improvement which can reasonably be deemed inconsistent with Dr. Mehta's opinion." (J. Stip. at 9.) In support of this argument, he points to six records from November 2014 to August 2015 (some of them past Plaintiff's date last insured) that appear to bolster Dr. Mehta's mental-status findings of irritable mood and tangential thought process. (Id.

at 8.)

True, some reports from that time period noted that Plaintiff had tangential thought process, pressured speech, labile affect, and angry affect. (See AR 109, 112, 116, 127, 132, 133, 869.) And in May 2015, one provider noted that he "tore up the place," throwing items and "scaring everybody."[9] (AR 863.) The provider also noted that Plaintiff had a "profound mistrust of others," especially those at the VA. (Id.)

Progress is rarely a straight line. "Cycles of improvement and debilitating symptoms are a common occurrence" in the mental-health context. Garrison v. Colvin, 759 F.3d 995, 1017 (9th Cir. 2014). For that reason, the Ninth Circuit has warned against "improperly singl[ing] out a few periods of temporary well-being from a sustained period of impairment." Id. at 1018.

But the ALJ here did no such thing. He cited and explained detailed reports from late 2013 until summer 2014 repeatedly contradicting Dr. Mehta's findings. (See AR 274.) And even reports from the same period relied on by Plaintiff cut against Dr. Mehta's findings. In late December 2014, for example, a social worker wrote that Plaintiff "sounded alert and oriented x 4." (AR 121.) His "speech was normal in rate and rhythm and thought process was linear and clear." (Id.) His "mood was

---

[9] It is not entirely clear that this behavior occurred in May 2015. Rather, in discussing with a medical practitioner the potential side effects of psychiatric medicines, Plaintiff expressed "a lot of fear" that if he took them he would "tear things up like PTSD," after which the author of the note recounts the incident. (AR 863.) Thus, the incident might refer to something that happened in the past that Plaintiff was afraid would happen again if he took the medication.

17

euthymic." (Id.) A few months later, a social worker made exactly the same assessment. (AR 120-21.) And in May 2015, to take just one other example, a mental-health treatment note stated that Plaintiff had "no restrictions." (AR 113.)

Plaintiff's mental-health improvement from the 2005 CPD to June 2015 comes as no surprise, moreover. During that period, he went from homelessness and drug addiction to generally sober living in his own apartment, with a network of family and friends. Indeed, Plaintiff described himself as "very happy" (AR 217) after 2013, "not as depressed" and "starting to feel capable of doing stuff" (AR 219).

Plaintiff maintains that the ALJ "unfairly punished [him] for relying on his church as support rather than the [VA] where [he] had issues." (J. Stip. at 9-10.) But the ALJ never did this. He simply noted Plaintiff's church involvement — along with his relationships with friends and family — to show that he did socialize and receive adequate emotional support. (AR 274.) That showing undercut his contrary statements to Dr. Mehta. (Id.)

Plaintiff's next argument fares no better. He stresses that his ability to pay bills, maintain personal needs, keep a clean home, manage his medications, use computers, maintain an interest in returning to school, and enjoy "handy work tasks" does not conflict with Dr. Mehta's opinion. (J. Stip. at 10.) For support, he cites Fair v. Bowen, 885 F.2d 597 (9th Cir. 1989). (Id.) There, the Ninth Circuit observed "that claimants [need not] be utterly incapacitated to be eligible for benefits, and many home activities are not easily transferable to what may be

the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." Fair, 885 F.2d at 603 (citations omitted).

But most of the activities noted by the ALJ here — paying bills, caring for personal needs, cleaning a home, and so forth — appear to be transferable to the workplace. See, e.g., id. at 604 (finding that ALJ properly discredited claimant's pain testimony because he remained able to care for all his personal needs and perform routine household maintenance and chores, among other things); Burch v. Barnhart, 400 F.3d 676, 680-81 (9th Cir. 2005) (finding that ALJ properly discredited claimant's pain testimony because she could care for personal needs, cook, clean, shop, interact with family, and manage finances); Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999) (upholding ALJ's finding that claimant's "ability to fix meals, do laundry, work in the yard, and occasionally care for his friend's child" was evidence of his ability to work). Moreover, as the ALJ found (AR 274), Plaintiff engaged in them over a sustained period, reasonably suggesting that contrary to his reports to Dr. Mehta, he retained adequate concentration and memory.

Finally, the ALJ here concluded that "it appears the claimant specifically asked to be seen by a psychiatrist so he could generate evidence" to support his disability appeal. (AR 274.) Plaintiff argues that if the ALJ rejected Dr. Mehta's opinion for that reason, he erred. (J. Stip. at 11 (citing Lester, 81 F.3d at 832 ("The purpose for which medical records are obtained does not provide a legitimate basis for rejecting

them.")).)  But even assuming error, it was harmless: as discussed above, the ALJ gave other specific and legitimate reasons for rejecting Dr. Mehta's opinion. See Robbins, 466 F.3d at 885 (error harmless when "it was clear from the record" that it was "inconsequential to the ultimate nondisability determination" (citation omitted)).

The ALJ reasonably rejected Dr. Mehta's opinion, and remand is not warranted.

**VI. CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g), IT IS ORDERED that judgment be entered AFFIRMING the Commissioner's decision terminating Plaintiff's Social Security disability insurance benefits, DENYING his request for remand, and in the Commissioner's favor.

DATED: June 24, 2021

JEAN ROSENBLUTH
U.S. Magistrate Judge